**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

LORI FRANK,
      Plaintiff,

v.

CITY OF FORT COLLINS, a municipality; TERENCE F. JONES, former Interim Chief of Police, in his individual capacity and JEROME SCHIAGER, former Deputy Chief of Police, in his individual capacity,

 Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff Lori Frank, through her undersigned attorney, Jennifer Robinson, hereby submits her Complaint and Jury Demand against the above named Defendants as follows:

### I.      REASONS FOR THIS LAWSUIT

      1.      The City of Fort Collins Police Department, now known as Fort Collins Police Services (hereafter "FCPS"), has historically been and continues to be a white male dominated workforce. Over the years women have entered the FCPS workforce as sworn officers, professional support personnel or administrative support personnel.  Not surprisingly, the pathway to equal opportunity, professional success and pay equity has been fraught with women who fell victim to a systemic culture at FCPS that marginalized the work efforts and contributions of its female employees.

      2.      The concerns of the female employees, as well as those of other protected classes, came to a head in August 2016 and could no longer be ignored.  As a result, then Chief of Police

John Hutto ("Hutto") sent an email to the entire workforce regarding employee workplace concerns and acknowledging that there might be people within the Department who had experienced discrimination, retaliation, or been targeted in some way and that these actions "have had an adverse effect on their careers."

3.      Hutto told the employees to "find a way to make [their] voice heard" and that they had his "personal promise" that their concerns would be taken seriously and addressed.

4.      As a result, fourteen separate complaints were lodged about the conduct of 12 employees.  A total of 62 allegations were made about violations of 17 departmental policies.

5.      Upon information and belief, many of the allegations were made by women within the FCPS against male supervisors, complaining of a culture of intimidation, marginalization, disrespect, bullying, disparate disciplinary actions and pay as well as highly subjective performance evaluations, based on gender.

6.      In spite of Hutto's promises to address the employee complaints, the complaints were not immediately investigated.

7.      Not surprisingly, the women employees were not the only protected class that fell victim to the FCPS's discriminatory practices. In September 2016 two FCPS Hispanic Police Officers filed a lawsuit against the City of Fort Collins based on the FCPS's policy, practice, or custom of discriminating against Latino/Hispanic officers and applicants, as compared to white officers and applicants.

8.      In the case of the Hispanic Officers, the discriminatory conduct was evidenced, in part, through FCPS's discrimination in its promotional and special assignment opportunities, its disparate disciplinary actions, its highly subjective performance evaluations, and its hiring process.

9. As part of the settlement of the Hispanic Officers' complaints FCPS was forced to commit to following up on the allegations made by police employees as a result of Hutto's email.

10. In early 2017 FCPS hired an external firm to conduct the investigations.

11. The "investigations" spanned more than a year and sustained five of the fourteen complaints.

12. The Investigative Summary categorized two of the complaints as complaints about "discrimination."

13. Both were found to be valid.

14. Despite these findings and contrary to Hutto's and the FCPS's promises, the FCPS has failed to address and remedy its discriminatory practices.

15. As a result, at least two women resigned from their positions with FCPS.

16. Plaintiff, Crime Analyst Lori Frank ("Frank" or "Crime Analyst Frank"), is one of the women who has suffered and continues to suffer discrimination based on her gender as well as retaliatory actions for complaining about that conduct.

17. In Crime Analyst Frank's case, the FCPS has allowed a systemic culture of discrimination against women to continue and flourish leading to adverse actions against her that has resulted in lost income, lowered position classification and lost advancement opportunities.

18. The FCPS has condoned a systemic culture that marginalizes women and the work they perform by paying women less than their male counterparts, classifying positions primarily occupied by women in a lower paying "Administrative" category as compared to classifying males who perform similar work in a "Professional" category that warrants a higher salary and pay range.

19. According to the Institute for Women's Policy Research the ratio of women's and men's median annual earnings was 80.5 percent for full-time/year round workers in 2017.  This

means a gender wage gap of 19.5%.  If the pace of change in the annual earnings ratio continues at the same rate as it has since 1960, it will take another 41 years, until 2059, for men and women to reach pay parity.  (See, Ex. 1, *The Gender Wage Gap: 2017, Earnings Differences by Gender, Race and Ethnicity*.)

20.     This lawsuit is intended to remedy those inequities to the full extent allowed by law.

## II. JURISDICITON AND VENUE

21.     This is a gender-based complaint authorized and instituted for violations of Title VII of the Civil Rights Act of 1964, as amended as well as the Colorado Anti-Discrimination Act, the Equal Pay Act and the Age Discrimination in Employment Act ("ADEA"). The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and 1343, 42 U.S.C. §1334, 42 U.S.C. §1983, 29 U.S.C. § 621and 42 U.S.C. §1367.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the employment practices herein that Frank alleges to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

23.     Plaintiff has complied with all conditions precedent to the filing hereof.  The Equal Employment Opportunity Commission ("EEOC") issued Plaintiff a Dismissal and Notice of Rights dated September 17, 2018.   This original Complaint and Jury Demand is filed within ninety (90) days of receiving the Notice of the Right to Sue from the EEOC.

### III.    PARTIES

24.      Plaintiff, Crime Analyst Lori Frank ("Frank" or "Crime Analyst Frank") is a natural person who resides in Colorado, has been an employee of the Fort Collins Police Services since 1999 and at all relevant times was a resident of and lived in Colorado.

25.      Defendant City of Fort Collins ("Fort Collins") is a Colorado municipal corporation.  Fort Collins, through its agent the Fort Collins Police Services (FCPS"), is Ms. Frank's current employer.  Fort Collins is the proper entity to be sued because it is an employer within the meaning of Title VII, the Age Discrimination in Employment Act ("ADEA") and the Equal Pay Act.

26.      Defendant former Interim Chief of Police Terry Jones ("Jones" or "Chief Jones") is the former Interim Chief of Police of the FCPS and is being sued in his individual capacity.  At all times relevant to this action, Chief Jones was a final policymaker for Fort Collins.

27.      The actions of Chief Jones, as more particularly described herein, were undertaken individually and as a final policymaker for Fort Collins.  Specifically, Chief Jones was an authorized decision maker for Fort Collins in his role as Interim Chief of Police for FCPS such that any and all of his decision adopting a particular course of action represents an act of official government policy.  Chief Jones's conduct, as more specifically described herein, was undertaken within the course and scope of his employment as a supervisor in the FCPS and under color of law.

28.      The FCPS Chief of Police delegated to or authorized Deputy Chief Jerome Schiager's ("Schiager" or "Deputy Chief Schiager") conduct described herein, thereby making Deputy Chief Schiager a final policymaker.  Defendant Schiager's unlawful actions were

reflective of his reaction of and conformity with a long-standing practice of discrimination against women, which had been condoned, permitted, or otherwise encouraged within the FCPS. Defendant Schiager's conduct, as more specifically described herein, was undertaken within the course and scope of his employment as a supervisor in the FCPS and under color of law.

29.     Defendant, Schiager is being sued in his individual capacity.  Schiager is currently employed by the FCPS as a police lieutenant and he is Crime Analyst Frank's former direct supervisor.

## IV.     GENERAL FACTUAL ALLEGATIONS

30.     The FCPS hired Ms. Frank as a Crime Analyst on or about June 1, 1999.

31.     Ms. Frank's date of birth is August 29, 1967.

32.     The Crime Analyst is a professional position and requires applicants to have a Bachelor's degree from an accredited college or university in criminology, statistics, computer sciences or a related field.

33.     In 1989 Ms. Frank received a Bachelor's of Art degree in Sociology with a minor in criminology from Colorado State University.

34.     The work of a Crime Analyst constitutes an integral part of the work of the FCPS. The position is responsible for researching, analyzing, interpreting and providing a variety of information on crime related topics and issues to the FCPS, various other agencies within the City of Fort Collins and the community at large.

35.     During her tenure with FCPS Frank established a pattern of excelling in all areas of her performance.

36.     Her performance reviews reflect that she was highly regarded for her knowledge,

skills, abilities and results achieved as a Crime Analyst.

37.     Dating as far back as Frank has maintained records, her supervisors have consistently rated her performance among the highest or near highest as follows:

- 2015 - On Track
- 2014 - 4 (Highest Rating possible)
- 2013 - Exceptional Results
- 2012 - Exceeds City Standards
- 2011 - Exceeds City Standards
- 2010 - Exceeds City Standards
- 2009 - Exceeds City Standards
- 2008 - Exceeds City Standards
- 2007 - Exceeds Expectations
- 2006 - Excellent
- 2005 - Excellent
- 2003 - High Quality
- 2001 - Above Average

38.     Not only has Frank received superior performance reviews from 14 different supervisors throughout the years she has worked for the FCPS, her work and reputation has led to her involvement on high level citywide critical functioning teams and projects that have agency wide impacts such as the FCPS Academy Planning Team, International Association of Chiefs of Police Nationwide Benchmarking Team, City of Fort Collins Budgeting for Outcomes Continuing Improvement Team, City of Fort Collins Malcolm Baldridge Team, FCPS Data

Conversion Team and Quality Assurance Committee as well as the City of Fort Collins Core Values Team.

39.     Frank is also a recognized expert in her field and has lectured and taught Crime Analysis at the college level including Colorado State University, University of Northern Colorado, Regis University and Front Range Community College.

40.     Frank's expertise and work product has also been used during high profile trials. For example, in the first trial in Larimer County against a Catholic Priest with multiple child victims, Frank provided a time-line presentation for this trial, which resulted in a conviction.  In meeting with the jury after the conviction, the jury was very specific about how Frank's work took a complex trial with years of sex abuse in a number of different locations around Colorado and made it simple to understand.

41.     The District Attorney was highly complementary of Frank's work product stating, "Crime Analyst Frank was asked to help prepare a timeline which was used during the trial. She went through many drafts based on changes we requested.  She also offered good insight after watching portions of the trial.   Based on her observations, she constructed an additional timeline.  Both were used during closing arguments and were very helpful and persuasive for the jury."

42.     In another case involving a serial rapist Frank was instrumental in "taking this complicated case and organizing it in a fashion that the jury would understand and comprehend was no easy task.  With the assistance of Crime Analyst Lori Frank, [the prosecution was] able to give the jury demonstrative aides to help them digest the mountain of evidence we needed to present in order to obtain a conviction."

43.     To further enhance her professional skills and ensure that they remain top notch, Frank maintains an active participation in the Colorado Crime Analysis Association, having served as President for 7 years.

44.     Frank is also an active member of the International Association of Crime Analysts, serving in multiple positions on its Executive Board.

45.     Frank has been commended for her participation in these organizations.

46.     Frank has become known throughout the country for her expertise as a Crime Analyst.  She has been a frequent lecturer on topics related to Crime Analysis and has conducted presentations both inside and outside the FCPS.

47.     A comment on her 2013 performance review indicated, "Lori Frank is a veteran crime analyst.  She possesses a detailed knowledge in her craft.  As such, she is recognized by many outside of our agency as a true professional.  I am aware that she has made several presentations to classes at Colorado State University regarding crime analysis."

48.     Frank has also received numerous accolades and awards such as the Excellence in Crime Analysis Best Publication from the International Association of Crime Analysts, Letter of Commendation from the Larimer County Sheriff's Office, Police Chief's Commendation award for the creation and work on a city-wide Crime Map and a Commitment to Excellence award.

49.     In addition, as Frank's expertise and skill level increased, she was asked to take on many additional responsibilities as they fell under her purview.  For example, when the Police Systems Analyst left, Frank absorbed many of those duties as well as duties formerly part of the responsibilities of the Planning and Research Manager.

50.     Crime Analyst Frank also assumed responsibility for the ICMA annual survey and

providing data compilation and content composition for the City Manager's Monthly Report and the Future's Committee project.

51.     Frank was instrumental in introducing predictive policing concepts to the FCPS and was asked by the staff psychologist to create a working database to look for trends in his data.

52.     In June 2014 as a result of Frank's added responsibilities and the constant redefining of her role as Crime Analyst and with the full support of her supervisor, Frank began the process of redefining/reclassifying her position/job title to that of "Senior Management Analyst."

53.     Under the City of Fort Collins's rules, practices and policies such adjustment are necessary when there is a substantive change in the duties and responsibilities of a current job due to changes in the organization, in business need, type of work, staffing requirements, or technology.

54.     Frank's reclassification was intended to align her actual primary functional areas of responsibilities to reflect the work she was actually performing.  Such work included conducting specialized, complex, multi-dimensional analytical management, operational, and administrative studies, collect extensive data, analyze data, produce useful reports, triage requests for information, assess requests and general business questions and apply her knowledge, skills and abilities to address and complete requests.

55.     During her 3rd Quarter 2015 Performance Review Frank's supervisor expressed his support for the reclassification and wrote, "Lori has been working on reclassification of her current position.  We were not able to complete this process before my leaving but I encourage

her to continue this effort with her next supervisor."

56.     Her supervisor further stated that, "Lori is responsible for the agency wide analysis and reporting for organizational activities.  She responds to a large number of requests as the normal course of her job.  Every task I have requested from her has been done in a timely manner and includes all the requested information."  "This quarter Lori has been a positive influence in the division.  She works toward the data driven goals of the organization."

57.     In November 2015 Assistant Chief of Police, Jerome Schiager became Crime Analyst Frank's direct supervisor.

58.     At the time John Hutto ("Hutto" or "Chief Hutto") was the Chief of Police of the FCPS.

59.     Prior to becoming her direct supervisor, Schiager participated in and/or condoned conduct that was demeaning and disrespectful towards women.  Such conduct devalued and minimized the work that the women performed and marginalized their efforts.

60.     For example, in 2011 Crime Analyst Frank prepared a Monthly Management Report that was instrumental in certain discussions and decisions related to the FCPS.

61.     When Schiager tried to take credit for the report, Crime Analyst Frank, who recognized this as one of the typical ways to devalue women and their efforts in the workplace, refused to be silent and allow Schiager to take credit for her work product.

62.     Thereafter, Schiager began treating Frank with disdain.  Although he was not Frank's direct supervisor at the time he was definitely in a position of authority at FCPS and his demeanor and attitude toward Frank grew "distant" and "cool."

63.     In addition, Schiager would direct Frank to perform tasks that compromised her

11

professional integrity.  For example, Schiager asked Frank to research police calls at a private

residence that City Manager, Darin Atteberry, was looking to purchase.  Because the property

was outside the FCPS's jurisdiction Frank did not have the authority to release the information.

64.      Frank recognized that Schiager's actions in placing her in a compromising

position professionally was also the type of conduct that devalued women and could result in

negative repercussions.

65.      In another incident, Schiager attended a training that Frank also attended, along

with others in the FCPS.  One of the attendees was another female member of the FCPS.  When

Frank went to a pre-scheduled lunch with the trainer, Schiager submitted a complaint to Frank's

supervisor because Frank had not invited the other female attendee to the lunch, accusing Frank

of "Jr. High behavior" for not inviting the other female attendee to the prescheduled and

unrelated lunch.

66.      Frank recognized that Schiager's actions in complaining to her supervisor was

also the type of behavior that devalued and stereotyped women.  There were several male

attendees at the training (including Schiager himself) that could have (but did not), invite the

female attendee to lunch but Schiager did not complain to any of their supervisors about their

failure to invite.

67.       In yet another incident Schiager began taking away Frank's work responsibilities.

For example, Schiager hired a consultant to complete a staffing, workload and redistricting

study.

68.      Although this had always been Frank's responsibility, Schiager cut Frank out of

the process and assigned one of his male friends, who had no previous experience, as lead on the

project.

69.     Frank recognized that the unwarranted removal of job responsibilities was the type of conduct that devalued and minimalized women, often resulting in their lower pay and status.

70.     In another incident, when Frank was asked for her input on a workplace study Frank responded with her opinion on the study.

71.     However, Schiager accused Frank of **again** showing "lack of support".

72.     Frank recognized that Schiager's accusations were belittling and career threatening to women and that women who were labeled as not being "team players" or showing "lack of support" were the type of accusations that resulted in further alienation in the workplace.

73.     Frank formally complained to Hutto about Schiager's accusations.

74.     As a result, on or about May 2014, Hutto issued Schiager a Letter of Reprimand for his unwarranted accusations against Frank.

75.     Schiager continued his "cool" and "distant" attitude towards Crime Analyst Frank after becoming her supervisor in November 2015.

76.     As a result, and in an abundance of caution related to Schiager's prior treatment of her, on or about November 3, 2015, Frank voiced her concerns about Schiager to Hutto. These concerns stemmed from Schiager's demeaning past treatment as discussed above and her concerns of Schiager's "retaliatory, malevolent and depreciatory behavior towards her" based, in part, on the Letter of Reprimand Schiager had received from Hutto earlier.

77.     Frank indicated in her complaint that Schiager had already marginalized her position, stripping away her job responsibilities and reassigning them to another employee

(male).

78.     Frank further complained that she had been working on a professional goal to reclassify her position and had recently made great strides towards accomplishing that goal but now feared that not only would she lose supervisory support, but Schiager would actively take action to prevent her from obtaining that goal.

79.     Frank further expressed concerns that Schiager would now have the latitude, liberty and authority to make her position very arduous, hostile and unpleasant.

80.     In that regard, Schiager frequently gave Frank the "cold shoulder", treated her "distantly" and caused the workplace to be uncomfortable, hostile and intimidating for Frank.

81.     As to Frank's efforts to get her job reclassified, as predicted, Schiager actively halted that process telling Frank and Human Resources that Frank's job description was adequate for her position and that she lacked the competency to satisfy her current job description.

82.     On or about May 13, 2016 Schiager issued Frank her 1st Quarter 2016 Performance Review.

83.     In the Performance Review Schiager made scathing remarks about Frank's performance indicating that it had "room for improvement", was a "very poor quality" and "did not represent good analysis work."

84.     Schiager further stated that there would be no change in Frank's job title or description at this time because Frank's job description describes the work she did and she was being paid within her range in accordance with City policy.

85.     Frank responded by presenting evidence that Schiager's criticisms of her performance were unfounded and that the timing of Schiager's comments was suspicious and

indicative of retaliation.

86.     Frank further responded that she was on track with her previous supervisor to have her job reclassified, she had the support of her previous Assistant Chief to reclassify her position and the work had been done to ensure that the reclassification would happen.

87.     Schiager's decision to halt the reclassification of Frank's job was discriminatory and retaliatory.

88.     On or about June 6, 2016 Schiager hired Erik Martin ("Martin"), a male, as a Financial Analyst.  Martin's date of birth is June 11, 1987.

89.     Martin and Frank were the only two analyst supervised by Schiager.

90.     Martin and Frank were equals on the organizational chart.

91.     Martin and Frank performed substantially the same type of analytical work in their respective areas of expertise.

92.     As equals on the organizational chart, Martin and Frank were subject to the same performance, evaluation and disciplinary standards.

93.     At the time Martin came on board Frank was a veteran FCPS employee with 17 years of service.

94.     Frank's annual salary at the time was $67,558.00.

95.     Upon information and belief, when Martin came on board his starting salary was $69,035.00 per year.

96.     At the time, Martin (who was 20 years younger than Frank) had been employed by the City of Fort Collins for less than a year and had no prior law enforcement experience.

97.     On August 4, 2016 Hutto sent an email to the entire department, including Frank,

regarding employee workplace concerns and acknowledging that there might be people within the Department who had experienced discrimination, retaliation, or been targeted in some way and that these actions "have had an adverse effect on their careers."

98.    Hutto told the employees, including Frank, to "find a way to make [their] voice heard" and that they had his "personal promise" that their concerns would be taken seriously and addressed.

99.    As a result, fourteen separate complaints were lodged about the conduct of 12 subject employees.  A total of 62 allegations were made about violations of 17 departmental policies.

100.    The complaints spanned years of systemic discrimination based on gender and race.

101.    Upon information and belief, like the aforementioned Hispanic officers, the women complained of hypercritical and inaccurate performance evaluations and unequal advancement opportunities that had been going on for years.

102.    Upon information and belief, concerns were also raised about lack of training and holding women back in spite of their seniority and excellent performance reviews.

103.    Upon information and belief, in one instance, shortly after getting married, a female officer was told that she should not get pregnant because it would impact her career.

104.    Upon information and belief, another female officer was denied time off where male officers were routinely granted time off under similar circumstances.

105.    On or about August 9, 2016 Frank sent another memo to Chief Hutto about Schiager's behavior and treatment towards her.

106.    Frank's complaints about Schiager became part of the newly initiated investigation.

107.    On or about August 23, 2016 Schiager issued Frank her 2nd Quarter Performance Review.  Schiager continued his prior negative comments about Frank's performance pointing out minor errors and indicating that errors did not help people build confidence in Frank's work.

108.    Frank again established that Schiager's comments were unwarranted.

109.    On or about September 17, 2016 the two Hispanic officers discussed above initiated a lawsuit (hereinafter "The Lawsuit") against the City of Fort Collins Police Department in the U.S. District Court for the District of Colorado, alleging that for decades the FCPS had fostered and condoned a culture of discrimination against Hispanic officers.

110.    On October 3, 2016 Frank met with Deb Mossburgh from Human Resources who confirmed that Schiager would not support any effort to determine if a reclassification of Frank's position was warranted.

111.    On October 5, 2016 Lori Greening ("Greening") the Human Resources Investigations Representative, sent Frank a letter indicating that she had received Frank's complaints regarding Schiager and would be "looking into any violations of [] City Personnel Policies and Police Services policies that may have occurred."

112.    Schiager remained Frank's supervisor while under investigation for allegations made by Frank.

113.    During the course of Frank's complaints about Schiager and the investigation into those complaints, both Schiager and Hutto began excluding Frank from work-related events and meetings and marginalizing her performance.

114.    On November 1, 2016 Hutto sent an email to over 50 departmental employees, including Martin, inviting them to his annual holiday party.

115.    Frank was the only employee who was not sent the email and not invited to the party.

116.    On November 15, 2016 Lori Greening notified Schiager that he had been cleared of any wrongdoing on her investigation.

117.    That night, at 10:18 p.m., Schiager sent Frank an email with the subject line as "FINAL L. Frank Performance Concerns Q3 2016.pdf".

118.    In the email Schiager attached a document that he indicated would be discussed with Frank at a meeting the following day.

119.    The document was a confidential memorandum regarding Frank's alleged performance concerns related to the third quarter feedback and indicating that Schiager was placing Frank on a Performance Improvement Plan "(PIP)".

120.    Employees on a PIP are not eligible for certain pay increases.

121.    Prior to issuing a PIP, HR policies require monthly meetings between a supervisor and subordinate to identify performance areas that need improvement and give the employee an opportunity to correct them.

122.    At no time prior to Frank's third quarter performance review or the issuance of the PIP did Schiager meet with Frank and advise her that there were any areas of her performance that required improvement.

123.    On November 16, 2016 Schiager also placed Frank on a 90-day PIP and gave her a "Needs Improvement" on her Performance Evaluation at the same time.

124.     The stated reason for the PIP was related to Ms. Frank's alleged "consistent pattern of errors in reporting data and a lack of analysis."

125.     The PIP imposed an error free standard on Frank that was not imposed on any of Schiager's male direct reports, including Martin, who were all subject to the same standards as Frank.

126.     An error free standard would have likely led to termination.

127.     Schiager also interfered with Frank's work performance, writing her up for minor incidents while turning a blind eye to similar behavior of males under his supervision, including Martin.

128.     Schiager's comments about the deficiencies in Frank's work product stands in stark contrast to previous comments from her Performance Evaluations such as, "you continue to pay attention to detail and accuracy in all aspects of your work" and "you are detail oriented, you strive for accuracy and are very conscientious about the quality of work you produce."

129.     Another comment indicated, "with all of the requests for information and data, Lori is very proficient and committed to providing quality, responsive customer service.  This last year, Lori told me that she has responded to over 320 requests for data and/or projects."

130.     Frank's co-workers that were also supervised by Schiager and held to the same standards as Frank had errors in their work product and were not disciplined.

131.     In fact Ms. Frank's actual "error" rate establishes that she had a 99.99% "accuracy" rate.

132.     On November 21, 2016 Greening sent Frank a memorandum indicating that she had conducted an investigation and concluded that Frank was not retaliated against based on

protected class or for other improper reasons.

133.   On November 30, 2016 Frank, through her then attorney, sent another complaint regarding Schiager's treatment towards her including her performance reviews and placing her on the PIP.

134.   Frank also requested an impartial investigation and that the evaluation by Schiager be removed from her personnel file and the PIP be rescinded.

135.   On or about December 22, 2016 Schiager acknowledged the disparate standards that Frank was held to, telling Frank that others had made errors but that he had not lost confidence in their performance.  But yet Frank's error rate of less than one-one thousandth of a percent was cause to lose confidence in Frank's abilities.

136.   Martin also had errors in his work product that were of comparable seriousness as those alleged to have been made by Frank.

137.   Upon information and belief, Schiager did not negatively evaluate Martin or place him on a PIP for his error rate.

138.   In addition, Martin was approved training for leadership opportunities while Frank was denied such training.

139.   On January 6, 2017 Schiager met with Frank and told her that her raise would not be effective until the PIP was resolved on February 15, 2015.

140.   On January 12, 2017 Schiager held a staff meeting, to which Frank had been a part of in the past, with all of his direct reports excluding only Frank.

141.   When Frank found out she asked what was the purpose of the meeting.  At that time she learned that Schiager had convened the meeting with his direct reports to have "staff"

meetings to be more communicative.

142. On January 1, 2017 annual pay raises came into effect.

143. Due to the PIP Frank did not receive an annual raise at that time, which she would have been entitled but for the PIP.

144. Upon information and belief, Martin's raise went into effect on January 1, 2017 adjusting his annual salary to $70,762.00.

145. Frank who had more seniority and was, in fact more senior, was still being paid $67,558.00.

146. FCPS withheld Frank's raise from January 1, 2017 through August 28, 2017 at a loss to Frank of $1,102.00.

147. On January 17, 2017 Frank was notified that there would be an administrative investigation of her allegations of "harassment, targeting and retaliation by Deputy Chief Jerry Schiager."

148. On January 26, 2017 Frank learned that Schiager had convened another staff meeting with his direct reports and that she was the only direct report not invited to attend the meeting.

149. Schiager continued to have staff meetings with all of his direct reports, excluding only Frank.

150. On or about February 7, 2017 Schiager was placed on administrative leave and Greg Yeager became Frank's temporary supervisor.

151. On April 12, 2017 Yeager sent Frank a memo on the status of the PIP that Schiager had placed her on, indicating that not completing the PIP could negatively affect

Frank's pay.

152.     Yeager declined to take any action on the PIP, effectively suspending the PIP and indicating that decisions or determinations about next steps and the status of the PIP will be made when additional information is available to the City.

153.     There was no indication of what "additional information" was required.

154.     As of February 15, 2017, the stated end date of the PIP, Frank had successfully completed all of the requirements as identified in the PIP.

155.     The extension of the PIP had significant ripple effects on Frank's reclassification efforts and her income.

156.     On or about April 18, 2017 Yeager issued Frank her 1st Quarter 2017 performance review completely reversing Schiager's negative evaluation of her performance.

157.     For example, on her alleged error problem, Yaeger observed that "Both Deputy Chiefs Haywood and Trobley told me they'd received timely and accurate reports from Lori when requested this quarter."

158.     Yaeger also indicated that Ms. Frank was "outperforming" in critical areas stating that "this quarter, Lori has positively helped with several projects and teams in need", "Lori quickly and positively helped the PD Systems manager when a long-term analyst resigned and he needed help with Crystal reports.  I received an email from the manager complimenting Lori.

159.     In May 2017 Hutto retired and Terry Jones became Interim Chief of Police.

160.     However, the marginalization and devaluing of Frank's work continued.

161.     For example, on or about June 19, 2017 Martin was assigned to head a workload and staffing analysis and provide a "Sworn Strength Report."

162.     This type of analytical work is not part of Martin's area of expertise but had been part of Frank's job description since she began working at FCPS.

163.     When Frank raised concerns about this she was told that when the project came up, the Assistant Chief, "didn't even think about [Frank]."

164.     As a result, Frank was not even thought of when it came to performing her own job and Frank had to campaign and fight to get the project back.

165.     This type of marginalization has been on-going since Schiager stripped the last workload/resource allocation study from Frank's responsibilities and gave it to a male co-worker.

166.     This is once again, a male assuming or being assigned to perform the more critical and visible portions of a female's job responsibilities leading to the perception that women are not as capable as their male co-workers ultimately resulting in lowered pay grades and position classifications.

167.     On or about July 21, 2017 Frank was given her 2nd Quarter 2017 Performance Review.  At this point, Jerrod Kinsman was evaluating her.  Kinsman also rated Frank as outperforming or on track on key components, stating in relevant part, "Lori is often looked to for expert advice, strategic work and ongoing project work within the scope of her role as a crime analyst. . . . Lori's depth of experience and knowledge make her able to react to unique and challenging requests for information.  She has been the agency's contact and gateway to Benchmark cities which this quarter has been drawn on for several challenging reasons."

168.     On July 27, 2017 Jones sent Frank a memo indicating that he (Jones), found that Frank's allegations against Schiager were "unfounded."

169.    However, upon information and belief, the investigation revealed that the error rate imposed on Crime Analyst Frank was unreasonable.

170.    On that same day Jones sent out a "Personnel Directive" indicating that Schiager would be transferred from the rank of Deputy Chief to Lieutenant.

171.    Schiager's reassignment from the rank of Deputy Chief to Lieutenant was a demotion in the form of ranking and status in the Department.

172.    Upon information and belief, Schiager's demotion was related to his adverse treatment against Frank as well as other department employees.

173.    On July 28, 2017 Schiager sent out a department wide email expressing his delight at the conclusion of the investigation.

174.    Schiager claimed that his downgrade in rank was not as a result of the investigation.

175.    On or about August 4, 2017 Martin assumed or was assigned responsibilities for portions of Frank's job responsibilities.  Martin was unqualified to perform Frank's job responsibilities.  Frank again had to campaign to be allowed to perform her own job responsibilities.

176.    On August 16, 2017 B. W., the FCPS Records Supervisor resigned because of concerns within the department stating, "I have watched, Ad nauseam, while the Chain of Command and IA [Internal Affairs] turn their heads to the reality here and struggle to justify this behavior."

177.    On or about August 16, 2017, fellow employee M. G. expressed concerns with Schiager's conduct stating "as someone who stood up to Jerry's unethical behavior and subjected

to months of no answers, no decisions, his message was like a kick in the face. There is a reason employees feel a need to lash out. One is the hypocritical behavior of staff."

178. M.G. further expressed that "Jerry [Schiager] should have been put right back on admin leave!!!! Well nothing will change. . . . I just need to get over it I guess."

179. M.G.'s concerns were related to the treatment of women at FCPS.

180. The FCPS systemic culture of discrimination against women continued.

181. For example, on or about November 8, 2017 Frank put in a request for a Leadership Development Program that was denied. However, Martin was approved for and attended multiple leadership development training sessions.

182. On December 13, 2017 Frank filed a Charge of Discrimination with the Colorado Civil Rights Division and EEOC complaining of discrimination based on her gender and in retaliation for engaging in protected activity.

183. On or about January 24, 2018 Jones sent out a departmental email on the Administrative Investigation and attached the Investigative Summary from the investigations based on the complaints that were made over a year earlier in August 2016.

184. Jones indicated that following the Lawsuit by the two Hispanic Officers the City and the Fraternal Order of Police encouraged employees to bring workplace concerns forward and that City Leadership had committed to providing a high-level summary report at the conclusion of the investigations.

185. Jones acknowledged long-standing problems within the department and also indicated that the data from last year's assessment highlighted "gaps in communication and process. We have diligently attempted to bridge those gaps with better agency-wide

communication following major incidents, consistent information coming from staff meetings, and revamped process standards, just to name a few. Changes in leadership have allowed fresh perspectives to take hold. Culture takes time to shift, but I believe we have turned in the right direction and are headed on a much healthier path."

186. The Investigative Summary indicated that, "as part of the lawsuit settlement, the City of Fort Collins committed to following up on allegations made by police employees."

187. The summary indicated 48 of the complaints were "Unfounded", 3 "Exonerated", 1 "Not Involved", 5 "Not Sustained" and 5 "Sustained."

188. Of the five sustained allegations, the summary indicated that:

Investigators determined five of the allegations to be sustained. These allegations involved two individuals who violated three different policies among them. One of these violations related to a discrimination allegation that impacted working relationships; it was not related to any adverse employment action affecting the complainant. The other two policy violations related to conduct and respect on-or-off-duty and conduct impacting effectiveness, efficiency, and morale. Both subject individuals with sustained allegations received discipline, one of whom was disciplined several years ago when the incident occurred and the original complaint was filed.

189. The summary further indicated that the two discrimination complaints were both sustained.

190. Upon information and belief, Schiager was one of the individuals about whom discriminatory allegations were sustained based on Frank's complaints.

191. Upon information and belief, the year-plus long investigation revealed that Schiager's error free standard that was imposed on Frank was not reasonable and discriminatory and/or retaliatory.

192. However, FCPS has continued to refuse to remove the PIP and the negative

evaluation that resulted from the unreasonable error free standard Schiager imposed on Frank.

193.    On January 24, 2018 Departmental employee, M. J. resigned her position as Police Officer stating, "I hope one day, inside the walls of the police building will be safer than the street."

194.    Upon information and belief, M. J. had also made complaints related to her treatment, as a woman, inside the department.

195.    On January 31, 2018, a mere four weeks after filing her EEOC/CCRD complaint, Frank receives a "Needs Improvement" in the behavior section of her 4th Quarter 2017 Performance Evaluation.

196.    During the early part of 2018 the City of Fort Collins was conducting a "Job Architecture" which examined and leveled every job within the City of Fort Collins based on the core knowledge, skills, abilities, and experience required to perform each job group.

197.    The jobs were then examined horizontally throughout the organization to ensure similarly situated jobs were leveled in the same way.

198.    Jobs would be classified under four different categories, Operational & Skilled Trade, Administrative, Professional and Managerial.

199.    During or around January or February 2018 Jones made the decision on the levels, titles and category placement of positions within FCPS as well as where each position was ultimately categorized.

200.    Upon information and belief, Jones was the final decision maker on how positions were structured within FCPS.

201.    On March 23, 2018 Defendant released the "Job Architecture" results.

202.    In the Protective Services area where Frank was placed, Frank's position of Crime Analyst was placed into the "Administrative" category instead of the "Professional" category.

203.    Martin's position was placed into the "Professional" category.

204.    Frank's pay scale was "A5" with a range of $51,927.00-77,891.00 and her salary was $70,990.00.

205.    Martin's pay scale was "P2" with a range of $53,856.00 - $89,760.00.

206.    Upon information and belief, Martin's salary at the time was $72,530.00.

207.    The definition of the Professional category states, "positions perform professional level work, developing solutions requiring analysis and research.  Responsible for critical work and/or complex projects within a technical context.

208.    Frank performs this type of work as a Crime Analyst.

209.    The sample job titles given for the Professional category include "Analyst."

210.    Among all positions in the city with the title of "Analyst", Crime Analyst was the only position not placed in the Professional category.

211.    Crime Analyst, like other Analyst positions that were reviewed as part of the Job Architecture process, are required to have a college degree.

212.    Positions in the Administrative category require only a high school diploma.

213.    The Administrative category has a lower pay scale than the Professional category.

214.    Other Professionals under Protective Services were at the "P3" level where the salary range was $56,400 at the minimum level, $75,200 at the mid-level and $94,000 at the maximum level.

215.    At the "P4" level, the salary range was $64,860 at the minimum level, $86,480 at

the mid-level and $108,100 at the maximum level.

216.    Upon information and belief Frank's Crime Analyst position should have been placed at the P3 or P4 level.

217.    As a 20-year employee Ms. Frank was being paid at a range of approximately 70% of the maximum salary.

218.    At the P3 range Frank's position should have been placed at the very least at the mid-point or 50% mark within that range entitling her to a salary of at least $75,200.00.

219.    At the P4 range Frank's position as a 20-year employee should have been placed at least at the mid-point or 50% mark within that range entitling her to a salary of at least $86,480.00.

220.    Ms. Frank is one of two Crime Analyst in the City of Fort Collins that was categorized as "administrative."  Both are women.

221.    In addition, two "Criminalist" positions were also slotted in the "Administrative" category instead of the "Professional" category.

222.    Like the Crime Analyst, the Criminalist position is also a professional position that requires a college degree and a high level of analytical skills.

223.    Both Criminalist are women.

224.    The only positions in the FCPS that were placed into the Professional category are held by males.

225.    On April 6, 2018 Frank amended her Statement of Discrimination to include the gender based discriminatory placement of her position as Crime Analyst in the Administrative category as opposed to the Professional category.

## V.     CLAIMS FOR RELIEF

**FIRST AND SECOND CLAIMS FOR RELIEF**
GENDER DISCRIMINATION IN VIOLATION OF TITLE VII
AND COLORADO ANTI-DISCRIMINATION ACT
(Against the City of Fort Collins)

226.    Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

227.    Crime Analyst Frank is a female and, as such, is a member of a class of citizens protected by Title VII.

228.    At all relevant times, Crime Analyst Frank performed her job functions competently and was qualified for her position with FCPS.

229.    As discussed more fully above, Crime Analyst Frank was paid less than her male co-worker who performed substantially similar work.

230.    As discussed more fully above, FCPS disciplined Crime Analyst Frank under circumstances giving rise to an inference of discrimination.

231.    FCPS denied Crime Analyst Frank a raise.

232.    FCPS categorized Crime Analyst Frank's position as "Administrative" rather than "Professional" because of her gender, resulting in a lower pay category.

233.    Male analysts were classified as "Professional."

234.    FCPS, by and through the conduct of its employees and agents, has unlawfully denied Crime Analyst Frank the benefits, privileges, promotional opportunities, and terms and conditions of her employment due to her gender.

235.    Crime Analyst Frank was subjected to adverse treatment based on her gender, including but no limited to written reprimands, overly critical performance evaluations, reduced

pay, pay disparity, and denial of reclassification of her position as well as improper classification of her position based on her gender, as detailed above.

236.    The effect of the practices complained of above has been to deprive Crime Analyst Frank of equal employment opportunities and otherwise adversely affect her status as an employee.

237.    The unlawful employment practices complained of above were intentional.

238.    The unlawful employment practices complained of above were done with malice or reckless indifference to Crime Analyst Frank's federally protected rights.

239.    Fort Collins's discriminatory actions did cause and will continue to cause Crime Analyst Frank to suffer economic losses as well as emotional distress and other significant injuries, damages, and losses.

240.    As a direct and proximate result of the acts and omissions described herein, Plaintiff has suffered and incurred, or may be reasonably expected to suffer or incur, the following damages and other losses, including but not limited to: lost income or employment compensation and fringe benefits, thereby justifying appropriate awards to Plaintiff of front pay and back pay; damage to reputation and character, emotional or mental anguish, distress, upset, humiliation, embarrassment, or degradation, pain and suffering; and other consequential, incidental,  or related damages to Plaintiff's employment rights, privileges, interests, as well as statutory interest, and reasonable attorney's fees and costs incurred in connection herewith.

**THIRD AND FOURTH CLAIMS FOR RELIEF**
**RETALIATION IN VIOLATION OF TITLE VII**
**AND COLORADO ANTI- DISCRIMINATION ACT**
(Against the City of Fort Collins)

241.    Plaintiff incorporates by this reference all preceding paragraphs as though fully

set forth herein.

242.    Plaintiff engaged in Protective Activity on November 3, 2015, February 2016,

September 9, 2016, October 3, 2016, the week following November 16, 2016, November 30,

2016, January 26, 2017, on or around March 15, 2017, June 19, 2017, December 13, 2017 and

April 6, 2018.

243.    As discussed more fully above, after Frank engaged in protected activity FCPS

took actions against Frank that would have dissuaded other employees from engaging in

protected activity, including but not limited to, issuing her negative performance evaluations,

issuing her a PIP, wrongly classifying her position, denial of raise and refusal to remove her from

the PIP after the time period for the PIP had ended.

244.    The unlawful employment practices complained of above were intentional.

245.    The unlawful employment practices complained of above were done with malice

or reckless indifference to the federally protected rights of Plaintiff.

246.    The retaliatory actions did cause and will continue to case Frank to suffer

economic losses as well as severe emotional distress and other significant injuries, damages, and

losses.

247.    The unlawful retaliatory practices and other acts or omissions of Defendants

directly and proximately resulted in such damages as may be proven at trial, including but not

limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish, distress, humiliation, embarrassment, and degradation, pain and suffering; and Plaintiff's attorney's fees in bringing this action.

## FIFTH AND SIXTH CLAIMS FOR RELIEF
## DISCRIMINATION IN VIOLATION OF THE ADEA
## AND COLORADO ANTI- DISCRIMINATION ACT
(Against the City of Fort Collins)

248.   Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

249.   Crime Analyst Frank's date of birth is  August 29, 1967 and, as such, is a member of a class of citizens protected by the Age Discrimination in Employment Act.

250.   At all relevant times, Crime Analyst Frank performed her job functions competently and was qualified for her position with FCPS.

251.   As discussed more fully above, Crime Analyst Frank was paid less than her male co-worker, Martin, who performed substantially similar work.

252.   Martin was born on June 11, 1987.

253.   As discussed more fully above, FCPS disciplined Crime Analyst Frank under circumstances giving rise to an inference of discrimination.

254.   FCPS denied Crime Analyst Frank a raise.

255.   FCPS categorized Crime Analyst Frank's position as "Administrative" rather than "Professional" because of her gender.

256.   Male analysts, including Martin, were classified as "Professional."

257.   FCPS, by and through the conduct of its employees and agents, has unlawfully denied Crime Analyst Frank the benefits, privileges, promotional opportunities, and terms and

conditions of her employment due to her age.

258.    Crime Analyst Frank was subjected to adverse treatment based on her age, including but no limited to written reprimands, overly critical performance evaluations, placing her on the PIP, reduced pay, pay disparity, and denial of reclassification of her position as well as improper classification of her position based on her age, as detailed above.

259.    The effect of the practices complained of above has been to deprive Crime Analyst Frank of equal employment opportunities and otherwise adversely affect her status as an employee.

260.    The unlawful employment practices complained of above were intentional.

261.    The unlawful employment practices complained of above were done with malice or reckless indifference to Crime Analyst Frank's federally protected rights.

262.    Fort Collins's discriminatory actions did cause and will continue to cause Crime Analyst Frank to suffer economic losses as well as emotional distress and other significant injuries, damages, and losses.

263.    As a direct and proximate result of the acts and omissions described herein, Plaintiff has suffered and incurred, or may be reasonably expected to suffer or incur, the following damages and other losses, including but not limited to: lost income or employment compensation and fringe benefits, thereby justifying appropriate awards to Plaintiff of front pay and back pay; damage to reputation and character, emotional or mental anguish, distress, upset, humiliation, embarrassment, or degradation, pain and suffering; and other consequential, incidental,  or related damages to Plaintiff's employment rights, privileges, interests, as well as statutory interest, and reasonable attorney's fees and costs incurred in connection herewith.

## SEVENTH CLAIM FOR RELIEF
## DISCRIMINATION IN VIOLATION OF THE EQUAL PAY ACT
(Against the City of Fort Collins)

264.    Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

265.    As described more fully above, Crime Analyst Frank and Martin performed substantially equal work at FCPS that required substantially equal skill, effort, and responsibility.

266.    As described more fully above, both Crime Analyst Frank and Martin performed their duties under similar working conditions.

267.    Martin was paid more than Frank.

268.    The pay differential between Crime Analyst Frank and Martin was not based on a bona fide seniority system, merit system, a system which measures earnings by quantity or quality of production or any factor other than sex.

269.    The unlawful practices complained of above were intentional, willful and done with malice or reckless indifference to Frank's federally protected rights.

270.    The unlawful practices directly and proximately resulted in such damages as may be proven at trial, including but not limited to lost income and benefits, lost employment opportunities; psychological, emotional, and mental anguish, distress, humiliation, embarrassment, and degradation; pain and suffering; and lost attorneys' fees and costs in bringing this action.

**EIGHTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 AND EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
(Against Defendants Schiager and Jones in their Individual Capacities)

271.     Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

272.     Plaintiff's Fourteenth Amendment damages claims against the individual Defendants for Fourteenth Amendment violations are brought under 42 U.S.C. § 1983.  The individual defendants were acting under color of law.  In taking adverse action against Plaintiff, Defendants Schiager and Jones acted pursuant to an official policy or custom of the District in discriminating against female employees.  The official policy or custom is established and further described above and fully incorporated herein.

273.     The Equal Protection Clause of the Fourteenth Amendment prohibits Defendants Schiager and Jones from denying Frank the equal protection of the laws.  It requires all persons similarly situated to be treated alike.

274.     When Schiager imposed discipline against Frank, he intentionally violated Plaintiff's constitutional rights under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by purposefully treating her differently from and more harshly than her male co-worker, Martin.

275.     The aforementioned individual is not the same gender as Frank.

276.     As discussed more fully above, Martin engaged in similar conduct that resulted in Schiager imposing discipline on and issuing Frank a PIP.

277.     As a result Frank did not receive her scheduled raise on January 1, 2017.

278.     Martin was not disciplined for his similar conduct.

279.     Martin received a raise on January 1, 2017.

280.     In addition, as discussed more fully above, Schiager made the decision to pay Martin more than Frank even though the work performed by each was substantially similar and even though Frank has years more experience than Martin.

281.     Schiager's unlawful disciplinary action and denial of a pay raise was a direct and foreseeable consequence of the PIP and violated Plaintiff's clearly established constitutional right to be treated the same as others outside her protected class.

282.     Schiager's decision to pay Martin more than Frank violated Frank's clearly established constitutional right to be treated the same as others outside her protected class.

283.     There was no rational basis for treating Plaintiff differently from Martin.

284.     When Jones categorized Frank's position as an A5 Administrative position and Martin's position as an P2 Professional position, he intentionally violated Plaintiff's constitutional rights under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by purposefully treating her differently from and more harshly than her male co-worker, Martin.

285.     Jones's actions resulted in Martin being paid more than Frank and Martin having a higher pay range than Frank.

286.     The individual Defendants' actions were taken in malicious, willful, wanton, reckless indifference to, deliberate indifference to, and/or reckless disregard of Frank's rights as guaranteed by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

287.     Defendants Schiager and Jones treated Frank less favorably than her similarly situated male counterpart.

288.     The effect of the practices complained of above has been to deprive Frank of equal employment opportunities, otherwise adversely affect her status as an employee, deprive her of her right

to make and enforce contracts, and deprive her of the full and equal benefit of laws, because of her gender.

289.    The unlawful employment practices complained of above were intentional.

290.    The unlawful employment practices complained of above were done with malice or reckless indifference to Frank's federally protected rights.

291.    As a result of the individual Defendants' conduct Frank is entitled to punitive damages.

292.    As a direct, foreseeable, and proximate result of Defendants' intentional unlawful conduct complained of herein, Plaintiff suffered injuries, damages and other losses, including but not limited to, lost wages and benefits, damage to reputation, and emotional distress.  These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

293.    Frank has incurred damages as a result of Defendants' conduct against her in the form of back-pay, front-pay, loss of fringe benefits, emotional distress, attorneys' fees, and out-of-pocket expenses.

WHEREFORE, Plaintiff prays for an award of all relief requested herein and that this Court enter judgment in her favor and award her all relief as allowed by law, including, but not limited to, the following:

a.    Actual economic damages as established at trial;

b.    Compensatory damages including, but not limited to, those for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of reputation and other nonpecuniary losses;

c.    Punitive damages;

d.    Tax penalty offset/enhancement;

e.    Pre-judgment and post-judgment interest at the statutory rate;

    f.    Attorneys' fees, costs and expenses; and

    g.    Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated this 13th day of December 2018.

                                /s Jennifer Robinson_____
                               Jennifer Robinson, Esq., # 24764
                               7900 E. Union Ave., Suite 1100
                               Denver, CO  80237
                               Phone: (303) 872-3063
                               E-mail:  jrobinson@raemployment.com

                               Attorney for Plaintiff

<u>Complaint Sent to Plaintiff:</u>
December 13, 2018